## STATE v. MORASCO.

No. 2385.   Decided December 4, 1912 (128 Pac. 571).

1. WITNESSES—COMPETENCY—CHILDREN.  A child who has the mental capacity to understand the obligations of an oath and who is capable of receiving just impressions of the facts of which he is to testify is competent to testify.  (Page 8.)

2. CRIMINAL LAW—DISCRETION OF TRIAL COURT—COMPETENCY OF WITNESSES—REVIEW.  Whether a child possesses the necessary qualifications to testify is for the trial court in the exercise of its sound discretion, and, in the absence of an abuse of discretion, its ruling will not be disturbed on appeal.[1]  (Page 2.)

3. WITNESSES—COMPETENCY—CHILDREN.  Under Comp. Laws 1907, sec. 3413, providing that children under ten years of age, incapable of receiving just impressions of facts respecting which they are examined, cannot be witnesses, the action of the court in holding that a boy six years old, who knows what it is to tell the truth and to tell a lie, and that he will be punished if he tells a lie, and that God wants him to tell the truth, and who shows capacity to receive impressions of facts, is competent to testify is not an abuse of discretion.  (Page 10.)

4. SODOMY—EVIDENCE—SUFFICIENCY.  Evidence *held* to support a conviction of assault with intent to commit the crime against nature.  (Page 10.)

---

[1] State v. Blythe, 20 Utah, 378, 58 Pac. 1108.

5. CRIMINAL LAW—EVIDENCE — CAUTIONARY INSTRUCTIONS. On a trial for assault with intent to commit crime against nature on a boy six years old, an instruction that the testimony of the boy should be examined with caution because of his age and unfamiliarity with the subject-matter under investigation, and that children are susceptible of impressions oftentimes erroneous, etc., is sufficient to safeguard the rights of accused as to the weight to be given to the testimony of the boy. (Page 14.)

6. CRIMINAL LAW—DEMONSTRATIVE EVIDENCE—ADMISSIBILITY. On a trial for an assault with intent to commit crime against nature on a boy, evidence of the substance found on the underwear worn by the boy at the time was admissible. (Page 14.)

APPEAL from District Court, Seventh District; *Hon. A. H. Christensen,* Judge.

Joseph Morasco was convicted of an assault with intent to commit a crime against nature. He appeals.

AFFIRMED.

*King & King* for appellant.

*A. R. Barnes,* Attorney-General, and *E. V. Higgins* and *George C. Buckle,* Assistant Attorneys-General, for the State.

McCARTY, J.

The appellant was convicted of an assault with intent to commit the infamous crime against nature. To reverse the judgment, he presents this appeal. The assault was committed, if committed at all, on Sunday afternoon, January 14, 1912. The trial was had the following month (February 16th), and the boy became six years of age in March, 1912. The boy was the only witness who testified to the actual occurrence.

The first error assigned and discussed by counsel relates to the ruling of the court in permitting the boy to be sworn and testify in the case. The grounds of the objection are that the boy was under six years of age, and that it was not shown that he had sufficient intelligence to understand the obligations of an oath or the mental capacity to receive just im-

pressions concerning the facts and circumstances to which his testimony related, and that under Comp. Laws 1907, section 3413, he was not a competent witness. This section, so far as material to this case, provides that "children under ten years of age, who appear incapable of receiving just impressions of facts respecting which they are examined or of relating them truly," cannot be witnesses. The boy was examined by the court, the district attorney, and by the attorney for the defendant regarding his competency to testify before he was sworn as a witness. In answer to questions asked him by the court, he said, among other things, that he knew what it was to tell the truth, and that he knew what it was to tell a lie; that he had heard about God; that God wanted him to tell the truth; and that God did not want him to tell a lie. "Q. Now, if you hold up your hand and promise or swear to tell the truth, the whole truth, and nothing but the truth, and you should tell a lie, what would be done to you? A. Punished." In answer to questions put to him by the district attorney, the boy stated that he knew what telling a lie was and that it was bad, and that telling the truth was good. In answer to questions propounded by the attorney for the appellant, he said he could count up to ten, and he did count to twelve, and stated that he could count up to thirty. He said he did not know what it was to take an oath, but stated that his mother had told him about God and that God would punish him if he did not tell the truth, and further said: "Well, my mamma would punish me; I mean to say that." Regarding the boy's capability of "receiving just impressions of the facts" and circumstances of the alleged assault, he was further interrogated by appellant's counsel in part as follows:

"Q. How long have you known Joe Morasco (appellant)? A. I just know him around our place. Q. Well, this is not Joe Morasco over there, is it? A. Yes, sir. Q. Who told you to tell everything that he said to you? A. He didn't tell me. Q. He didn't tell you to keep still? A. He didn't tell me to keep still—he was making the noise. Q.

He was making the noise. Did he say halloa? A. No. Wiggle. Q. What was he doing? A. Peeing in my pants. Q. Do you know what he peed with? A. Yes, sir. Q. What? A. His Peter. Q. Did you see his Peter? A. No, I felt it. Q. Where? A. On my bottom. Q. What is your bottom? A. I am on it. Q. Where did you feel it? A. On my bottom. Q. Can you point to it? A. (Indicating.) Q. He did not put anything in you, did he? A. No."

The foregoing is a brief summary of a somewhat lengthy, and in some respects rigorous examination of the boy on his *voir dire* regarding his competency to testify. The authorities almost uniformly hold that the true test of the competency of a child of tender years is not age, but intelligence.

If the child has the mental capacity to understand the obligations of an oath—that is, appreciates the difference between truth and falsehood—is sensible of the impropriety of telling a falsehood, and that it is his duty to tell the truth, and is capable of receiving just impressions of the facts of which he is to testify, and has the ability to relate them correctly, he is a competent witness. The following are a few of the many authorities which support this doctrine: Wharton on Evidence (9 Ed.), section 366; Underhill, Crim. Ev., p. 253; Jones on Evidence, section 740; 40 Cyc. 2200; *Wheeler v. United States*, 159 U. S. 523, 16 Sup. Ct. 93, 40 L. Ed. 244; *People v. Swist*, 136 Cal. 520, 69 Pac. 223; *State v. Meyer*, 135 Iowa, 507, 113 N. W. 322, 124 Am. St. Rep. 291, 14 Ann. Cas. 1.

Moreover, the authorities almost uniformly hold that the question of whether an infant possesses the necessary qualifications to testify in a case is one to be determined by the trial court in the exercise of a sound discretion, and unless it is made to appear that this discretion has been abused his rulings in this regard will not be disturbed by the appellate court. This court, in harmony with the great weight of authority, held in *State v. Blythe*, 20 Utah, 378, 58 Pac. 1108, that, when "objection is made to the competency of a child under ten years of age, it becomes

a question ad'dressed to the sound discretion of the trial court, and the appellate court will not interfere, if the lower court, upon examination made upon its *voir dire,* or upon all of its testimony, concludes that the child is competent to testify, unless there is a clear abuse of discretion apparent from the record. . . . And this for the reason that the trial court, having the witness before it, is better able to judge of its capability or incapability than the appellate court, whose judgment must be based wholly upon the record. Not age, but capability of receiving just impressions of facts and of relating them truly, are the tests of competency, und'er the statute. Hence if the child appears to have such capability— that is, to possess sufficient sense of the danger and impiety of false swearing—or is sensible of the wickedness of telling a deliberate lie, it may be admitted as a witness, regard·less of its age."

We invite attention to an extensive discussion of this question found in a note to the case of *State v. Meyer, supra,* 14 Ann. Cas. 3, in which the leading English cases and many d'ecisions of this country, both Fed'eral and state, are cited and reviewed and are summarized by the annotator as follows:

"That the true test of the competency of an infant is intelligence and not age is, however, the view taken by all the modern authorities. And since the trial judge, whose duty it is to ascertain by an examination of the infant whether he shows sufficient intelligence to be a witness, is in a better position to observe the infant's conduct, and to determine whether he possesses or. lacks intelligence, than the judges of an appellate court who have only the record of the case before them, it has been generally held that the decision of a trial judge admitting or rejecting an infant witness will not be disturbed unless it clearly appears from the record that the trial judge has abused his discretion."

We are clearly of the opinion that the court did not err in holding that the boy was a competent witness and permitting him to testify. Moreover, the court gave the jury the following cautionary instruction regarding the testimony of the boy:

"I charge you that the testimony of the boy, Robert Rosser, should be examined with care and caution, for it is manifest

that he is but a boy of tender years, and unfamiliar with court matters and not thoroughly conversant with the English language or subject-matter under investigation, and children of his age are susceptible of impressions that are ofttimes of erroneous character, and it is with difficulty that they can ofttimes repeat, accurately, the things which they see or hear, and therefore the testimony of a child of this kind should be examined with care and caution; nevertheless, if, under all the circumstances, you believe that the testimony given by him is entitled to credit, you should not disregard it on account of his being a child of tender years."

Appellant in his assignments of error assails the verdict on the ground that it is not sustained by the evidence. It is contended with much earnestness that the evidence, when viewed in the light most favorable to the state's theory of the case, does not justify the conviction. At the time of the alleged assault (January 14, 1912) Robert Rosser was living with his parents at Mohrland, a small railroad or mining town in Emery county, this state. The state's evidence tended to show that the crime charged was committed at or near the residence of a man by the name of Tony. This place, designated in the record as Tony's house, and described by the witnesses as a "dugout—a shanty in the hillside or mountain"—and hereafter referred to as shanty, is situated almost 400 feet northwest from the boy's home. The evidence tends to show that Tony was not at home when it is claimed the crime was committed. There was a tent occupied by a man who is referred to in the record as the "tallyman" situated a short distance from the shanty. Owing to the roughness of the ground and several large rocks, "boulders," the shanty cannot be seen from the tent and only a portion of it—the roof and a part of the walls—can be seen from the boy's home. There are no residences other than those mentioned in the immediate vicinity of the place where it is claimed the crime charged was committed. There is a much traveled road or highway passing near the boy's home and in the vicinity of the shanty. There is an apparent conflict in the evidence as to the distance this road is from the

shanty. William Rosser, the boy's father, testified that the shanty is about 400 feet from the road. The boy on cross-examination seems to have located the road much nearer to the shanty than his father did. His father, however, testified, and his testimony on this point is not denied, that there is another road leading to and from a powder house that passes within about 150 feet of the shanty, and that road is much nearer to the shanty than the highway above mentioned. There is a space of several hundred feet along these roads from which the shanty can be seen.

On the afternoon of January 14, 1912, Robert Rosser, his two brothers aged eight and ten years, respectively, and his sister aged nine years were playing together, riding a pony, and passing the afternoon in other childish pastimes in the vicinity of their home. It is admitted that while they were playing on that occasion the defendant, who was on his way from town to the mine at which he was employed, stopped and mingled with them for a short time; that the father of the children, observing the defendant with them, went to where he was and spoke to him. Robert Rosser testified that he saw the defendant at Mohrland "on the hillside by our place. Right in front of the door." "Q. What did he do, if anything? A. Why, he peed in my pants. Q. How did he do that? A. With his Peter. I was up by his place. Q. Who do you mean by his? Tony's place? A. Tony's. . . . Q. Were you standing up or lying down, or how? A. Lying down." The district attorney, addressing the witness: "Get down here. Q. Where was he when you were lying down? Like that? A. He was on top of me. Q. Well, what did he do to your pants, if anything? A. Unbuttoned them. Q. Whereabouts did he unbutton your pants? . . . A. In the back. Q. When you were on the ground and he was on top of you, did you feel anything? A. Yes, sir. Q. What did you feel? A. I felt his Peter . . . right here. Q .Well, where do you mean by right here? A. On my bottom. Q. Could you see him? A. Yes, he was on top of me. Q. Well, could you see his Peter? A. No, I felt it. Q. Then did

you get up, afterwards? A. After he peed in my pants we got up. . . . Q. And then what did he do? A. Well, he wiped me . . . with a sock. Q. . . . Wiped where? A. My pants out with a sock. Q. Did you button yourself up? A. No, he buttoned me up. . . . Q. You said Joe (the defendant) said something to you? A. He said he would give me some candy. Q. Then where did you go? A. I just saw him shovel the path up with snow. Q. What do you mean? A. Covered it up. Q. Covered what up? A. The path. Q. You mean that you shoveled the snow out of the path? A. No, in the path. Q. What did you use? A. A shovel. Q. Where did Joe go? A. He went down to the store. Q. Did you at any time, Robert, after you got home that day or at any time tell anybody about what had happened up there with you and Joe? A. I told mamma when I was going down the path." The evidence showed that at about 4 o'clock p. m. on that same day the boy went with his mother from their home to the machine shop where his father was at work.

On cross-examination, which was both thorough and rigorous, the boy, among other things, stated that the defendant did not hurt him; that they were good friends, and that he "liked Joe;" that the defendant unbuttoned his (the boy's) pants. "Q. And Joe told you if you would come down to the store he would buy you some candy? A. Yes, sir. He didn't go. He was fooling." That when he and Joe were playing on the ground "lots of folks" passed close by them and saw everything that was going on there. "Q. And you had seen them before and lots of times, hadn't you? A. No. Just that one time when I was going up. Q. What? A. Just that one time when I was going up. . . . Q. While you was down on the ground, Joe didn't unbutton his pants at all? A. No, sir. Q. It was his fingers he had up against you? A. Yes, sir. Q. Your bottom? A. Yes, sir. Q. He didn't put his finger into your body? A. No."

John Rosser, who was playing with his sister, his brother Robert, and another small brother on the afternoon of the

day in question (January 14, 1912), testified that on that occasion he saw the defendant near his (the witness') home; that afterwards while still at play he saw his brother Robert and the defendant together between the home and Tony's shanty; that at the time he saw them he and his sister were riding a pony going from the shanty to their home, and that Robert and the defendant were going in the direction of the shanty. Nellie Rosser, the boy's mother, was called as a witness and testified that on the morning of the day in question (Sunday, January 14, 1912), she put clean underclothes on the boy Robert; that she was ill and from 1 o'clock until about 4 o'clock p. m. she was confined to her room lying down; that between 4 and 5 o'clock that afternoon she and her husband, William Rosser, examined the underclothing of the boy and found a "dry stiff spot, a little larger than a dollar" on the front of his drawers. William Rosser, the boy's father, testified that he examined the clothing and found thereon "a dried substance . . . about two inches in diameter;" that it was a light color—very nearly the color of the underwear—and in his opinion the stain was caused by the "discharge of semen" on the boy's clothing; that he examined the boy's body but found no marks, bruises, or other evidence of violence.

The defendant was sworn as a witness and denied that he was at Tony's shanty on the day in question, and denied that he criminally or otherwise assaulted the boy.

We think the evidence amply justifies the verdict. The contention that the discrepancy in the boy's testimony renders it unworthy of belief is untenable. The discrepancy, in so far as it relates to the facts and circumstances immediately connected with and surrounding the commission of the crime charged, is more apparent than real. The persistency with which counsel for defendant objected to practically every question asked the boy on his direct examination and the prolonged, searching, and rigorous cross-examination to which the child was subjected might well have confused and bewildered a much older and more experienced person. There is not a circumstance or incident of the trial referred to in the

record that even suggests that the boy was in any sense a designing witness or that he had been coached or instructed as to what his testimony should be. His answers were frank and artless, and showed entire candor on his part. His testimony showed that he did not have the slightest conception of the revolting character of the assault. In fact, his tender age precludes any inference that he knew or should have known that the defendant's conduct, as he related it, was anything more than a mere impropriety. Therefore his testimony that he entertained no ill feelings toward the defendant, but that he "liked" him, does not necessarily weaken or neutralize the effect of his evidence wherein he describes the defendant's conduct—what he did in making the alleged assault.

The court, as we have pointed out, instructed the jury that they should, because of the boy's tender years, examine his testimony with care and caution. Thus the defendant's rights in this regard were fully protected.

Defendant also assigns as error the rulings of the court in admitting, over his objections, the testimony of William and Nellie Rosser respecting the substance they found on the boy's underwear. It is contended that this evidence did not tend to prove "criminality or wrongdoing on the part of the defendant," but that it nevertheless "tended to produce a prejudice against the defendant" in the minds of the jury. This evidence related to a material fact which the jury were entitled to consider in connection with the other evidence in the case in determining whether the crime charged had been in fact committed. (*People v. Swist,* *supra.*) The defendant in the case cited was convicted of making an assault of the character of the one here charged on a boy six years of age. The mother in that case, as here, examined the child's clothing after the assault was made and testified to its appearance, and testified to the appearance of a substance she found in the clothing and as to what the substance was. The testimony was objected to as incompetent. The Supreme Court of California held that the testimony was competent, and that it was properly admitted. There

are numerous other errors assigned, but they do not contain sufficient merit to warrant us in discussing them.

The judgment is affirmed.

FRICK, C. J., and STRAUP, J., concur.