## STATE v. WILLIAMS.

No. 6932. Decided May 6, 1947. (180 P. 2d 551.)

See 70 C. J. Witnesses, Sec. 123; Mental condition as affecting competency as witness of prosecutrix for rape, note, 26 A. L. R. 1502. See, also, 44 Am. Jur. 976.

*Gustin & Richards,* of Salt Lake City, for appellant.

*Grover A. Giles,* Atty. Gen., *A. John Brennan,* Deputy Atty. Gen., and *Brigham E. Roberts,* Dist. Atty., of Salt Lake City, for respondent.

McDONOUGH, Chief Justice.

Appellant was convicted of the crime of rape, sentenced to prison, and he appeals. The alleged victim was a 13 year old subnormal girl whose mental age was between 8 and 10, and who had frequent epileptic seizures.

Appellant's two principal assignments of error are interrelated. He contends (1) that the trial court erred in ruling that the prosecuting witness was competent to testify, and (2) that the court erred in denying defendant's motion for a directed verdict of acquittal in that the evidence did not warrant a contrary verdict.

Prior to being permitted to testify as to the principal facts of the accusation, the prosecuting witness was examined by counsel and the court in response to defendant's objection as to her competency. The printed record leaves much to be desired as to the mental capacity of the witness relative to both aspects of competency discussed by Mr. Whigmore, viz:

"(1) First, it involves a capacity *mentally to understand* the nature of questions put and to form and communicate intelligent answers.

"(2) Secondly, does it involve a sense of *moral responsibility*, of the duty to make the narration correspond to the recollection and knowledge, that is, to speak the truth as he sees it? It would seem that the clear absence of such a sense would disqualify the witness. * * *" Whigmore on Evidence, Sec. 495.

Especially is the record unsatisfactory as to the second recited aspect of competency. The sum total of what was elicited from the witness by means of leading questions was the statement that she knew the difference between the truth and untruth and that she would tell the truth. Furthermore, the witness, insofar as revealed by the record, had difficulty in understanding questions of an uncomplicated nature propounded to her by counsel. However, the trial judge had the advantage of having the witness before him. He was in a position to observe not only her demeanor but the tempo of question and answer, the attitude and tone of voice of counsel and the probable effect upon the child of the court room environ-

ment. Hence, much of importance to his decision respect-ing the competency of the witness was available to the trial judge which the record does not reveal to us. He exercised his discretion in the light of such additional factors, and we are unable to say with conviction that his ruling thereon was an abuse of such discretion. See *State* v. *MacMillan*, 46 Utah 19, 145 P. 833; *State* v. *Morasco*, 42 Utah 5, 128 P. 571; *State* v. *Blythe*, 20 Utah 378, 379, 58 P. 1108.

We pass to the second recited assignment.

The rape was alleged to have occurred some time on July 22, 1945, and the theory of the State was that it occurred during the time that defendant had his car parked in front of the home of the alleged victim. There are some facts which are not disputed. On July 22, 1945, defendant at-tended an outing of employees of the institution with which he was identified. He drove his car to Utah Lake, accom-panied by his sister, and by another young couple. Upon his return from the outing, he took his sister home, and while the other couple were with him in the car, he stopped in front of the home of the alleged victim about 9:30 p. m. (war time), which was about dusk. He parked his car parallel with and but a few feet from a row of hedge. There was a small patch of weeds between the rear part of the car as parked, and the hedge. It was in this patch of weeds, according to the evidence on behalf of the State, that the alleged rape occurred.

According to defendant, he went to the house in question in an effort to contract an aunt of the little girl to ascertain where to locate another girl with whom he was acquainted. This aunt lived next door with her mother, whom we shall refer to as the grandmother. At the time in question, the grandmother of the little girl was at the home of the child. Inasmuch as the testimony of three of the State's witnesses tended to corroborate the account of the defendant, as to his movements, and to conflict with his testimony on relatively minor matters, we shall first relate his testimony.

He testified that he left the car and went directly over to the house and knocked on the door, and asked if the young

lady with whom he was acquainted was there. When informed that she was not, he stated that she was a friend of the girl who lived next door (the little girl's aunt). After this conversation at the door, he left and returned to the car. He said he did not see the alleged victim. On cross-examination he said he might have told the police officer that as he got into the car some little girl said something to him as he drove away which was not audible to him. He testified that he went directly from the car to the house, and from the house he returned directly to the car and drove away.

The young lady who was in the rear seat of the car was called to testify for the State. She testified that when defendant stopped in front of the home of the 13 year old girl she saw him get out of the car and walk up the driveway and disappear from sight. At that time she saw a little girl walk across the lawn toward the driveway. About 15 or 20 minutes after defendant left the car he returned to the car, and the witness saw him come around the rear of the car and get into the car and drive off. As he came around the rear of the car, witness saw a little girl follow him, but nothing was said between them. She could not tell whether it was the same girl she had seen before, and she did not know if it was the alleged victim. She testified that she neither saw nor heard anything unusual during the absence of defendant from the car.

The testimony of the grandmother was to the following effect: She saw defendant stop his car in front of her daughter's home and get out of the car and come toward the house. The front door of the house will not open. She next saw him at the rear door where he knocked. First she testified that she did not know if the 13 year old granddaughter was in the house at the time, but on cross-examination she testified that the girl was in the house at the time defendant was at the back door. She testified further that she had a conversation at the door with defendant which lasted about five minutes; that defendant asked her if her daughter, who was married and who was then working,

was at home. The witness stated that she was disturbed when defendant asked for her daughter, and she became angry during the conversation. She stated that defendant wanted to know where he could find a girl named Leah with who he was acquainted. She saw defendant leave the back door after which she talked to her daughter, the mother of the little girl, for about five minutes and then went across the alley to her own home to get some matches because the lights went out. When the witness went outside, the 13 year old grandchild was outside. She said she was at her own house about four or five minutes, although on preliminary hearing she testified that it took her only one minute to get a match and get back to the home of her daughter. When she came back the little girl was in the bathroom crying, her dress covered with weeds. She admitted that at the preliminary hearing she testified that she went over to her own home just after defendant left the door, and that the lights went out before defendant left. The lights went out when her daughter dropped an electric iron.

The mother of the alleged victim also testified that her little girl was inside the house when defendant came to the door. She did not see the defendant stop the car nor get out of the car, but she testified that she saw defendant come to the front door and knock; that she did not answer the call because that door did not open. Defendant then went around to the back door. She answered and when she heard inquiry about her sister, she spoke to her mother and the conversation was carried on between the grandmother and defendant. At this time her little girl was in the front room watching her iron. She heard defendant make inquiry as to where he might find a girl named Leah who was a friend of the witness' sister. The conversation between the grandmother and the defendant lasted four or five minutes. She did not see her little girl leave the house. The only exit was the back door where defendant was standing. When the lights went out she got a fuse and the grandmother left to get some matches. It was about five minutes before she saw her mother (the grandmother) again. In the mean-

time, the witness went out the back door, saw her little girl in the middle of the back yard ,and witness went around to the front to the fuse box and put in a new fuse. She estimated that 10 or 15 minutes elapsed between the time defendant left and the time when the lights went out. After she put in the fuse she went around to the rear of the house and her little girl went into the bathroom. There were weeds on her dress and in her hair. She was crying. The mother asked what was wrong, and the child said that something had happened, "that man got me." When asked what man, she replied, "That man that was at the door." The witness saw blood on the child's legs and noticed an odor of discharge. The child said, "It hurts, mamma." The mother placed her on a bed and called a physician and also called the police. The child was then taken to a hospital for an examination.

On cross-examination the mother admitted that at the preliminary hearing she testified that after defendant left the back door she had time to iron only two handkerchiefs when she dropped the iron and blew a fuse; and that the time she met the girl at the back door crying was just after she blew the fuse. She also admitted that at such hearing she stated that after defendant came to the back door it could not have been over five minutes until she saw her daughter again. She stated that the child was given a prescription of phenobarbital three times a day under the orders of a physician by reason of her epileptic seizures, one of which occurred that morning. The little girl had been out of the house most of the day. The witness also stated that when her daughter was asked to show the officers where the alleged attack occurred, it was in the patch of weeds in front of the hedge, between the hedge and the street.

The chemist who testified for the State stated that he made a chemical and microscopical examination of spots on the little girl's underclothes, found a reaction for seminal fluid, but no definite evidence of sperm. It was impossible to tell whether the fluid came from the body of a male or female.

The physician who examined the girl at the hospital testified that he found a secretion in the vagina, but found no spermatozoa. He found two lacerations of the hymen about a centimeter and a half in length. The examination disclosed no abnormal secretion. He was unable to state the cause of the lacerated hymen, nor the cause of bleeding. He expressed the opinion that were the girl injured earlier than about the time of the alleged attack, walking, and rubbing of parts might continue the flow of blood, and that the reddened condition of the vulva could have been caused by exercise. He found all parts otherwise normal. There was evidence of penetration by some object.

The little girl who was the alleged rape victim, apparently testified under extreme difficulties in consequence of her afflictions. She said saw the defendant *two years* ago; that he got out of his car and she was lying down in the weeds at the time; that he drove his car down the lane; that he wanted to see her aunt; that he was at the back door and asked her mother where the aunt was working, and that he then went home. She said he did not say anything to her and she would not talk to him; that he did something to her; that he told her to "lay down there," and that he drove away in his car leaving her in the weeds. She then testified in detail as to the facts of the alleged crime by the defendant. Suffice it to say that her testimony, if believed, supported the charge. She testified on cross-examination that defendant told her to lie down in the weeds as soon as he first got out of his car, then he went to talk to her mother; that he laid her down in the weeds before he talked to her mother. The weeds were right by the car. She said she was standing by the car and he grabbed her and laid her on the ground and said,

"I am going to give you something. I have got something for you."

Such statements were allegedly made right after defendant got out of the car. She testified that he then went down the lane, and then "He went home." She also said she went out of the house as he drove up in his car. She definitely and repeatedly testified that she was lying in the weeds when

he drove up in his car. She also said that he laid her on her back. She stated that she saw the defendant drive up at the time she was in the house talking to a baby.

The little girl insisted that all of the defendant's alleged contacts with her took place in the weeds between his car and the hedge. Most of the time she insisted that she was lying in the weeds when he came, and that the alleged acts occurred immediately when he got out of the car. Part of the time she related events as if the alleged events took place after defendant left the house. That the alleged attack did not occur before defendant went to the back door of the house is clear from the testimony of the mother and the grandmother, though the young lady in defendant's car did say that she saw a little girl walking across the lawn after Williams got out of the car. It is clear that she was in the house while defendant was at the back door. That she was attacked just prior to that time is beyond the realm of even remote possibility. If the attack occurred after defendant left the house, it was during the interval between a short time before the blowing of the fuse and its replacement. Furthermore, according to the only testimony relative to the place of the attack, it was within a few feet of a car parked on a public street at dusk, the occupants of which heard or saw nothing unusual during defendant's absence. The record reveals that the defendant was not acquainted with nor had he ever seen the alleged victim before the occasion in question.

Under such state of the record, may the verdict of guilty be permitted to stand? We think not. We are not unmindful of the settled rule that it is the province of the jury to weigh the testimony and determine the facts. Nevertheless, we cannot escape the responsibility of passing judgment upon whether under the evidence a jury could, in reason, conclude that the defendant's guilt was proved beyond a reasonable doubt. This is not to say that merely by reason of the fact that the circumstances surrounding an alleged assault of this nature created a reasonable doubt in the mind of this court that the offense was in fact committed, we will set aside

a verdict. The total picture presented by the record here considered must be kept in mind in evaluating the result here reached. We have before us not merely a happening which must be considered not in harmony with general experience, coupled with the doubtful testimonial capacity of the only witness to the principal fact in issue, but the further fact that such witness was suffering from an affliction which itself might account both for her physical condition and for her story of the improbable attack.

The judgment is reversed and the case remanded for further preceedings consistent with this opinion.

PRATT, WADE, and WOLFE, JJ. concur.

LATIMER, J., not participating.