364 P.2d 109

STATE of Utah, Plaintiff and Respondent,

v.

Lawrence Albert HORNE, Defendant and Appellant.

No. 9380.

Supreme Court of Utah.

Aug. 14, 1961.

**163**

Craig T. Vincent, Salt Lake City, for appellant.

Walter L. Budge, Atty. Gen., Ronald N. Boyce, Asst. Atty. Gen., for respondent.

CALLISTER, Justice.

Defendant was convicted of the forcible rape [1] of a female over the age of 18 years, sentenced to prison for 10 years to life, and he appeals.

The rape was alleged to have occurred sometime during the early morning hours of June 15, 1960. The prosecutrix was a married woman, 21 years of age, and was living, at the time, with her two young children in a trailer house located in a trailer court in Clearfield, Utah. Her husband was in the armed services and stationed overseas.

The defendant, an unmarried man of 23, lived in the home of his parents which was located about 100 yards from the trailer court. He and the prosecutrix were acquainted, and he had been a visitor to her trailer house on previous occasions. He admits having had intercourse with the prosecutrix, but denies the act was accomplished by force or violence, but on the contrary was with her consent.

In State v. Mills,[2] this court stated:

" * * * If the State's evidence is so 'inherently improbable,' as to be unworthy of belief, so that upon objective analysis it appears that reasonable minds could not believe beyond a reasonable doubt that the defendant was guilty, the jury's verdict cannot stand. Conversely, if the State's evidence is such that reasonable minds could believe beyond a reasonable doubt that the defendant was guilty, the verdict must be sustained."

With the foregoing principle in mind, we examine the State's evidence in the instant case, which is substantially as follows:

The prosecutrix testified that on the night of June 14, 1960, she retired to her bed in the trailer at about 10:30 p. m., leaving both doors and all of the windows open and unlocked. She had placed her two-year-old daughter in bed with her and her three-year-old son in an adjacent bedroom. Some time after midnight she was awakened when the defendant rang her doorbell. He identified himself and, without invitation, entered the trailer. As to what then transpired, the prosecutrix testified:

---

1. 76-53-15(3), U.C.A.1953.

2. 122 Utah 306, 249 P.2d 211, 212.

"A. He opened the refrigerator and looked in the refrigerator and asked me if I had any coke in the house, and I said no, I didn't have any. He asked me why, and I said I didn't keep any in the house. And he was still in the kitchen at this time.

"Q. And where were you? A. I was still in the bedroom.

"Q. Then what happened after he went to the refrigerator? A. He closed the refrigerator, and then he turned on the light in the kitchen.

"Q. Did you have any further conversation with him? A. Yes. I thought he was looking for Bonnie, because he had come to my house the night before looking for her.

"Q. Did you make any statement to him with regard to Bonnie? A. I told him Bonnie wasn't there. That she was at home.

"Q. Did he say anything in response to that? A. He said he wasn't looking for Bonnie. That he was looking for me.

"Q. All right. What happened then, Mrs. ———? A. Then he walked back into the bedroom.

"Q. Did he make a statement at that time? A. Well, I told him to go away. To go home. That I didn't want anything to do with him. And he said that he wasn't going to go away, and go home.

"Q. After he had stated that he wasn't going to go home, what happened, if anything, after that? A. He took off his pants.

"Q. Did he make any statement at that time? A. I asked him what he was doing, and he said he was going to make love to me.

"Q. Then what did he do? A. Then he climbed on the bed.

"Q. Where were your children at this time? A. My little girl was at the head of the bed, on the right of me. My little boy was asleep in the other bedroom.

"Q. Will you relate the events then, after he came to the bed, Mrs. ———? As you best remember them? A. He kept trying to put his hands on me, and kept trying to put his mouth on me. And I kept pushing him away, and struggling with him. My little girl woke up and she started to cry, and she kept saying she wanted a drink of water, and finally I told Larry: 'Please, I have to go to the bathroom.' I thought if I got to the bathroom that he'd think I had locked the door and he'd leave, but there wasn't a lock on the bathroom door.

"I was in the bathroom about 10 or 15 minutes, and he kept telling me to come out, and I told him I wasn't going to, and then he opened the bathroom door. He found out it wasn't locked, and he came to the bathroom door and opened it, and he pulled me out of the bathroom and back into the bedroom.

"Q. What happened after you were taken back to the bedroom? A. Well, we struggled for quite awhile more, and Larry kept throwing me on the bed, and I would manage to get away from him, and then he would pull me back, and I couldn't get away from him.

"Q. Was anything happening to your clothing during this time, Mrs. ———? A. Oh, he pulled my slip down, down to my waist, and he tried to take my pants off, and I had ahold of my pants with my one hand, and he pulled them off of me. I couldn't hold them up.

"Q. And after he had your pants off, what happened then? A. Then he threw me back on the bed. And I was so tired and my little girl kept crying for a drink of water, and at one time my head hit her in the stomach, and I said: 'Stop it. You're hurting my little girl,' and he said: 'I'm not hurting you. If you'd quit fighting me,' he said: 'then none of this would happen.'

"Q. Did you continue to struggle? A. Yes, I did. I begged him to let me go, and he wouldn't. He wouldn't leave me alone.

"Q. What happened after that, Mrs. ———? A. Well, after this he got me on the bed, and I don't know exactly how he got me pinned down. I couldn't move, but anyway I kept trying to push him off, and I pulled his hair and I hit him, and it didn't do any good. He acted like he didn't feel anything. And then he had intercourse with me.

"Q. Will you tell us how that was done? A. What do you mean by that?

"Q. Tell us how he accomplished the act of intercourse with you. A. Well, he had my legs pinned down some way. I can't remember just how. It's pretty much of a blur, the memory of it, but I couldn't move. And finally he let me go, and I went into the living room."

Prosecutrix, on direct examination, further testified that after defendant left she went back to bed, but did not sleep. She arose about 6 a. m., and at approximately 6:30 a. m., visited a friend, Thelma, who occupied a nearby trailer. She told Thelma that the defendant had raped her. Later, about 3:00 p. m., she visited a doctor and advised him of the alleged rape. Still later, at 7 p. m., she informed the police.

Thelma was called as a witness and corroborated the early morning conversation related by the prosecutrix. The doctor whom she visited in the afternoon did not testify. The officer who answered the summons of the prosecutrix was called as a witness and, after verifying the receipt of the complaint, identified a bed sheet, pair of green panties, and a folder of matches which had been given to him by the prosecutrix.

Upon cross-examination, the prosecutrix testified that the defendant arrived at her trailer around 1 a. m. and did not leave until about 4 a. m. That at no time did she turn on a light, although light switches were easily within her reach. She stated that approximately one-half an hour elapsed, during which period the defendant made advances minus his pants, between the time the defendant arrived and the time she went to the bathroom. In order to get from the bed to the bathroom she had to pass the open rear door. She did not attempt to leave by this door because, "I wasn't going to leave my two children in the house with him there." However, she stated that the defendant had not in any way molested the children.

Further, on cross-examination, the prosecutrix admitted going out with other men and having entertained one man in her trailer for several hours. Other than the alleged rape by the defendant, she denied having had intercourse with anyone other than her husband.

Defendant, on the witness stand, admitted that at the outset the prosecutrix resisted his advances and asked him not to commit the act. She told him she was afraid of becoming pregnant. However, he testified that the prosecutrix, after returning from the bathroom, voluntarily engaged in the act of intercourse.

■ The old rule of "resistance to the utmost" is obsolete. The law does not require that the woman shall do more than her age, strength, the surrounding facts, and all attending circumstances make it reasonable for her to do in order to manifest her opposition.[3] However, in determining the sufficiency of the evidence, there must be considered the ease of assertion of the forcible accomplishment of the sexual act, with impossibility of defense except by direct denial, or of the proneness of the woman, when she finds the fact of her disgrace discovered or likely of discovery to minimize her fault by asserting force or violence, which had led courts to hold to a very strict rule of proof in such cases.[4]

■ Did the prosecutrix in this case do what was reasonable in light of her age and strength, the facts and attending cir-

3. State v. Roberts, 91 Utah 117, 63 P.2d 584, 587.

4. 44 Am.Jur. p. 970.

cumstances to manifest her opposition? We think not.

It is of highest significance that the prosecutrix, during the three-hour period defendant was in her bedroom, made no outcry. This despite the fact that all doors and windows were open and there were occupied trailers within 20 to 30 feet from hers. Her three-year-old son, sleeping in the adjacent bedroom was not disturbed.

The prosecutrix did not attempt to leave the trailer to seek help, although she had ample opportunity. When she went to the bathroom the defendant, according to her testimony, had already removed his pants and had made indecent proposals and advances. Yet, she did not avail herself of the opportunity to seek help. It is the natural impulse of every honest and virtuous female to flee from threatened outrage. Her explanation that she did not want to leave the children alone with the defendant is a rather weak one, to say the least. It would have taken less than a minute to rouse her neighbors. Furthermore, she left the defendant with the children for 10 to 15 minutes while she was in the bathroom.

There was no evidence of marks or bruises upon either party. This, after an alleged struggle which lasted three hours! There was no evidence of any threats made to either the prosecutrix or her children.

The green panties introduced into evidence had a torn elastic band, but otherwise were intact. The materiality of the bed sheet introduced into evidence is not shown in the record. The defendant admitted the act of intercourse.

True, in corroboration of her story, the prosecutrix made complaint to her friend, Thelma, at 6:30 a. m., more than two and one-half hours after alleged rape. However, had she truly been outraged, it would seem more likely that complaint would have been made immediately after the defendant left. It was not until 7 o'clock in the evening that she notified the police.

In State v. Williams [5] this court stated:

"Under such state of the record, may the verdict of guilty be permitted to stand? We think not. We are not unmindful of the settled rule that it is the province of the jury to weigh the testimony and determine the facts. Nevertheless, we cannot escape the responsibility of passing judgment upon whether under the evidence a jury could, in reason, conclude that the defendant's guilt was proved beyond a reasonable doubt. This is not to say that merely by reason of the fact that the circumstances surrounding an alleged assault of this nature created a reasonable doubt in the mind of this court that the offense was in fact com-

5.  111 Utah 379, 180 P.2d 551, 555.

mitted, we will set aside a verdict. The total picture presented by the record here considered must be kept in mind in evaluating the result here reached. * * *"

We have carefully evaluated the testimony of the prosecutrix and conclude that it is so inherently improbable as to be unworthy of belief and that, upon objective analysis, it appears that reasonable minds could not believe beyond a reasonable doubt that the defendant was guilty. The jury's verdict cannot stand.

Reversed.

WADE, C. J., and HENRIOD, McDONOUGH, and CROCKETT, JJ., concur.