**STATE of Utah, In the Interest of J.F.S., a Person Under Eighteen Years of Age.**

No. 900124–CA.

Court of Appeals of Utah.

Dec. 6, 1990.

Gary Pendleton (argued), St. George, for appellant.

R. Paul Van Dam, State Atty. Gen., and Charlene Barlow, Asst. Atty. Gen. (argued), Salt Lake City, for appellee.

Before BILLINGS, JACKSON and ORME, JJ.

## OPINION

BILLINGS, Judge:

J.F.S. appeals from a juvenile court adjudication finding him delinquent. His adjudication was based upon convictions of offenses which, if he were an adult, would have been rape, in violation of Utah Code Ann. § 76–5–402 (1989), and attempted rape, in violation of Utah Code Ann. §§ 76–4–101 and 102 (1989), both first degree felonies. J.F.S. claims the evidence was insufficient to support the finding that he committed rape and attempted rape. We affirm.

We recite the facts in a light favorable to the decision of the fact finder. *See Security State Bank v. Broadhead*, 734 P.2d 469, 470–71 (Utah 1987); *In re K.K.H.*, 610 P.2d 849, 852 (Utah 1980); *Grahn v. Gregory*, 800 P.2d 320 (Utah Ct.App.1990).

In 1989, J.F.S. was fifteen years old and attending high school in Utah. Fifteen year-old P.A. was a friend and classmate of J.F.S. On Halloween day 1989, a friend told J.F.S. that P.A. found him attractive. As a result, J.F.S. approached P.A. After talking for a while, J.F.S. and P.A. ar-

ranged to meet at school that evening so they could go trick or treating together.

P.A. had moved to Utah in August of 1989 and was temporarily living with her aunt. On Halloween evening, P.A. asked her aunt to drop her off at school, and she and J.F.S. met as planned. Shortly thereafter, the two started walking down a pathway behind the school on their way to a friend's house. According to P.A.'s version of the events that evening, when the couple passed the high school swimming pool and pump room, J.F.S. pushed P.A. into the pump room through an opening in the side wall, and started to fondle her. As J.F.S. fondled and kissed P.A. she ducked away from him, and exited the pump room through the opening in the wall. P.A. began walking away from the pump room, while reminding J.F.S. of his girlfriend, R.G. As she was walking away, J.F.S. took hold of P.A. and forced her back into the pump room through an unlocked door. P.A. testified she was scared and did not want to go into the pump room. P.A. held on to the sides of the doorway in order to keep from being forced into the room. When J.F.S. "nudged" her, she lost her footing and grip on the doorway and stumbled into the pump room. After J.F.S. shut the door, he held P.A. against the door and began kissing and fondling her. P.A. testified that she kept telling him "no" and that they "were friends," but J.F.S. didn't respond. J.F.S. continued to fondle her and began to undo her pants. P.A. then testified that she was on the ground and J.F.S. had his hands down her pants. J.F.S. pulled down her pants and underwear and lay on top of her, holding her arms and straddling her. P.A. struggled, hitting him once in order to make him stop. J.F.S. then forced P.A. to have intercourse.

J.F.S. had told some friends earlier that he might have sex with P.A. that evening. His friends stayed near the school and tried several times to look into the pump room. At trial one of J.F.S.'s friends, K.J., testified that he could hear voices coming from the pump room, but the words were distorted by the sound of the pump. Although K.J. could not tell what P.A. and J.F.S. were saying, he testified that P.A. did not call for help. When asked why she did not call out to J.F.S.'s friends for help, P.A. said she didn't cry out because the boys were "running around and laughing" and "if they knew what was going on they thought it was a joke."

After J.F.S. forced P.A. to have intercourse, he asked her if she had any diseases. She answered no and said she had never had sex before. After she put her clothes back on, P.A. called her friend, A.S., from the telephone located in the pump room. At this time, P.A. did not mention the events of the evening.

After the incident, J.F.S. and P.A. left the pump room and P.A. went to a convenience store, where she bought ice cream and telephoned her cousin to come pick her up. P.A. testified that she did not report the rape because she "felt dirty" and "didn't think anybody would believe her," and was leaving the next day to go live with her parents in Maryland.

On the morning P.A. was to leave for Maryland, the friend she called from the pump room, A.S., came to P.A.'s house to retrieve some clothing. When A.S. asked P.A. how she was doing, P.A. began shaking and crying and said that she hated J.F.S. When A.S. asked why, P.A. said that he was "forceful" and showed A.S. bruises on her arms, which were in the shape of a hand.

Shortly after she moved to Maryland, P.A. reported the incident to the principal of the Utah high school after he called and told her he had heard rumors that J.F.S. had been bragging in the boys' locker room about his conquest. P.A. said she had not told her parents what had happened until after the phone call because she was "embarrassed."

The second charge concerns A.S., who P.A. visited on the morning of her departure for Maryland. A.S. had known J.F.S. since middle school, and had gone on group dates with him. On May 22, 1989, at about 5:15 p.m., A.S. was waiting in the high school lobby for the school bus. J.F.S. approached her and they started talking. J.F.S. then grabbed her school bag and

began running. A.S. chased after him, and when she caught up to him J.F.S. said he had left something in the gym and asked her to help him find an open gym door. The outer door of the girls' locker room was open and they went in. They left the lights off so the janitor would not know they were inside. A.S. testified she felt no reason to be concerned at that time.

After J.F.S. and A.S. walked through the locker room, J.F.S. said he remembered he left the item in his locker, so they started walking back to the door which led outside. When they had almost reached the door, J.F.S. grabbed A.S.'s arm and began to kiss her. A.S. kissed him back, and then said she needed to hurry back in order to catch her bus. The two laid down on the floor and continued to kiss. When J.F.S. started to unbutton her shirt and pull her underwear down, A.S. "started getting scared" and told him she "did not want that." He acted like he didn't hear. A.S. testified that she told J.F.S. to stop, but he continued pulling her underwear down. A.S. again told J.F.S. to stop, and also to get off of her, but he ignored her and inserted his finger in her vagina. She was unable to get him off so she began scooting across the floor toward the door. J.F.S. then tried to insert his penis in her vagina. A.S. told him to leave her alone, and turned sideways trying to get to the door. A.S. testified that she hit J.F.S. "really hard" when he tried to insert his penis, and eventually was able to push him off. The testimony at trial was confusing and in dispute as to whether J.F.S. accomplished penetration.

After A.S. pushed J.F.S. off, she got up, went around the corner and started crying. J.F.S. followed her and said he was sorry. Shortly thereafter A.S. realized she had blood running down her legs and went into the bathroom. She cleaned herself off, then went out and boarded the school bus.

A.S. claimed she did not tell her parents what had happened because she felt that what had happened was her fault and was not rape because J.F.S. was a good friend. She thought that "rape would be some guy from an alley coming down, big old beard, you know, hurting you, a weapon and everything."

The day after the incident with A.S., J.F.S. wrote her a note in which he said they shouldn't see each other again. A.S. said the note made her "mad" and she felt J.F.S. was insensitive. About five days later, A.S. wrote in J.F.S.'s yearbook that she was "really sorry about everything" and hoped they would stay friends.

J.F.S. was charged with rape in both of the incidents, as well as one other as to which the court found the evidence insufficient to establish guilt because of the "victim's" consent. At trial J.F.S. testified that both A.S. and P.A. consented to the sexual activities. He claimed P.A. had sexual intercourse with him willingly. With A.S., J.F.S. admitted he removed his penis from his pants and placed it in the area of A.S.'s crotch, but denied penetration and claimed he ceased when he learned A.S. was not a willing participant.

With regard to the incident with P.A., the juvenile court found J.F.S. had committed rape. The court found J.F.S. had planned the rape, and P.A. had withdrawn from any consensual participation long before the rape occurred. The juvenile court found that J.F.S. had committed attempted rape in the incident with A.S. The court did not find actual penetration beyond a reasonable doubt but specifically found A.S. had not consented.

On appeal, J.F.S. claims there was insufficient evidence to support his convictions of rape of P.A. and attempted rape of A.S. While we note defendant's concern that rape is easy to charge but hard to defend and that his case has some unusual aspects,[1] we emphasize that this court is not reviewing the case de novo, but after a full trial on the merits in which the juvenile court judge found J.F.S. had committed

---

1. P.A.'s post rape going for ice cream is not typical conduct of a rape victim. Further, her alleging rape only after being told by the principal that she was the object of locker room gossip raised credibility concerns. These facts, however, were before the trial court, whose job it is to weigh credibility. The trial judge found P.A.'s testimony credible notwithstanding the problems noted and we will not disturb his assessment on appeal.

rape and attempted rape. We will reverse the juvenile court's findings only if they are "against the clear weight of the evidence" or this court "reaches a definite and firm conviction that a mistake has been made...." *State v. Walker*, 743 P.2d 191, 193 (Utah 1987). *See also In re R.R.D.*, 791 P.2d 206, 208 (Utah Ct.App.1990).

## RAPE OF P.A.

Under Utah law, a person commits rape when he or she has "sexual intercourse with another person, not [their] spouse, without the victim's consent." Utah Code Ann. § 76–5–402 (1989).

■ In the present case, J.F.S. does not deny that he had sexual intercourse with P.A., but claims P.A. consented to the act. Utah has long held that consent as a defense to a charge of rape is a highly fact sensitive issue, where great deference should be afforded to the fact finder.[2] *State v. Herzog*, 610 P.2d 1281 (Utah 1980); *State v. Studham*, 572 P.2d 700 (Utah 1977). In *Herzog*, for example, the defendant claimed there was insufficient evidence to support the jury's rape verdict. As in this case, the defendant alleged the victim had consented to sexual intercourse. A jury found the act nonconsensual, and convicted the defendant of rape. In upholding the conviction, the Utah Supreme Court stated: "[t]he determination of whether ... consent was present or absent in any given case is factual in nature, and is thus a matter for determination by the finder of fact." *Herzog*, 610 P.2d at 1283. *See also Studham*, 572 P.2d at 701 ("Most crimes are committed in such secrecy as can be effected, and that is particularly so [in rape].... Therefore the question of guilt or innocence often depends upon the weighing of the credibility of the victim against the accused.").

In 1989, the consent provisions of the Utah rape and sexual abuse statutes were modified,[3] and the defense of consent significantly narrowed. Focusing on the changes relevant to rape, the new statute eliminates the requirement that the victim "earnestly resist"[4] the assailant, and adds

---

2. In this fact sensitive area, defendant has the burden of marshaling all the evidence supporting the juvenile court's finding of lack of consent and then demonstrating that all the evidence, when viewed in a light most favorable to the juvenile court's finding, is insufficient to support a finding of lack of consent. *See, e.g., Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985); *Williams v. Miller*, 794 P.2d 23, 27 (Utah Ct.App.1990); *Call v. City of West Jordan*, 788 P.2d 1049, 1052 (Utah Ct.App.1990); *Utah ex rel. P.H. v. Harrison*, 783 P.2d 565, 566 (Utah Ct.App. 1989) (specifically holding marshaling doctrine applies to juvenile proceedings). Defendant's effort at marshaling the supporting evidence was less than complete.

3. The portions of the previous statutory definition of consent relevant to this case include:
   An act of sexual intercourse, sodomy, or sexual abuse is without consent of the victim under any of the following circumstances:
   (1) When the actor compels the victim to submit or participate by force that overcomes such earnest resistance as might reasonably be expected under the circumstances; or
   (2) The actor compels the victim to submit or participate by any threat that would prevent resistance by a person of ordinary resolution; ....
   Utah Code Ann. § 76–5–406 (1988).

4. Recently, the concept of consent in rape and sexual assault cases has been called into question. Commentators and courts have documented that resistance, in the face of rape or sexual assault, tends to escalate the amount of force used during the attack, thereby putting the victim at further risk. *See, e.g., Elimination of the Resistance Requirement and Other Rape Law Reforms: The New York Experience*, 47 Alb.L. Rev. 871, 884 (1983) (significant data from law enforcement personnel suggest that if a victim resists, the rapist is likely to escalate the amount of force used in the attack, therefore, police have advised women not to resist if attacked, since resistance could further endanger the victim's safety). *State v. McKnight*, 54 Wash.App. 521, 774 P.2d 532, 534 (Wash.Ct.App.1989) ("Moreover, studies show that resistance increases the risk that the perpetrator will employ violence or that the victims will receive greater injuries than if no resistance were offered.... [One] recent trend, in recognition of the fact that a victim's resistance increases the likelihood of the attacker's use of violence, has been ... to dispense with the resistance requirement altogether....").

   Other studies indicate that, while some women respond to sexual assault with active resistance, others freeze. *People v. Barnes*, 42 Cal.3d 284, 721 P.2d 110, 118, 228 Cal.Rptr. 228, 237 (1986) (citing Symonds, *The Rape Victim: Psychological Patterns of Response*, 36 Am. J. Psychoanalysis 27, 29–36 (1976)). Ironically, under the old "earnest resistance" standard victims

specific circumstances which will rebut an allegation of consent. Utah Code Ann. § 76–5–406 (1990) provides in relevant part: [5]

> An act of sexual intercourse, rape, attempted rape ... is without consent of the victim under any of the following circumstances:
>
> (1) the victim expresses lack of consent through words or conduct;
>
> (2) the actor overcomes the victim through the actual application of physical force or violence.

Utah appellate courts have yet to address this new statutory definition of "without consent."

■ J.F.S. argues that because the evening began as a date and preliminary consensual kissing and fondling occurred, it follows that P.A. consented to intercourse within the statutory meaning. J.F.S. also claims P.A.'s failure to cry out, her delayed reporting and the lack of physical evidence prove P.A. consented to sexual intercourse. Utah authority supports a contrary conclusion.

The fact that preliminary consensual kissing and fondling occurred does not, as J.F.S. claims, negate P.A.'s claim that she did not consent to sexual intercourse. In *State v. Myers*, 606 P.2d 250 (Utah 1980), a jury convicted the defendant of rape, and subsequently the trial judge arrested judgment. The trial judge found that the victim, who willingly engaged in kissing and fondling with the defendant, had "practically invited what had happened to her." *Id.* at 252. The Utah Supreme Court reversed the trial court's decision and ordered the verdict reinstated, stating:

> The view so expressed seems to suggest that if a woman is "friendly" in accepting the proffered hospitality of a

man ..., and engages in "necking," that is, kissing and hugging, and that this persists over a period of time, she loses her right to protest against further advances the man may desire to force upon her; and thereby subjects herself to such advances and should be deemed to consent to intercourse if he, but not she, so desires. Neither this Court nor the law will justify any such conclusion.

*Id. See also State v. Herzog*, 610 P.2d 1281, 1283 (Utah 1980) ("One does not surrender the right to refuse sexual intimacy by the act of accepting another's company, or even by encouraging and accepting romantic overtures.").

Similarly, P.A.'s failure to cry out and her delayed reporting do not establish that P.A. consented to sexual intercourse with J.F.S. In *State v. Lovato*, 702 P.2d 101, 108 (Utah 1985), the defendant asserted that "the failure of the complainant to attempt escape or to cry for help when opportunities presented themselves adds to the improbability of her version of the incident." In affirming the defendant's conviction of sexual abuse, the Utah Supreme Court stated:

> [T]he mere failure to make an ... outcry does not render a conviction unsupportable and [w]hether an outcry should have been made, depends upon how practical and effective it might have been.

*Id.* at 108 (quoting *State v. Studham*, 572 P.2d 700, 702 (Utah 1977)). *See also State v. Archuleta*, 747 P.2d 1019 (Utah 1987).

J.F.S. was a friend, someone P.A. trusted. When J.F.S. pushed P.A. into the pump house and began the assault, she was undoubtedly surprised and confused. Further, as the rape progressed P.A. testified that she did not cry out because the only people within hearing distance, J.F.S.'s

---

who refused to actively resist out of fear of escalating the violence, or victims whose natural response was to freeze, would be found to have consented to the attack.

5. The revised statute clearly applies as both incidents occurred after April 24, 1989, the effective date of the statute. Nevertheless, defendant failed to address the revised statutory definition of "without consent" either before the juvenile court or in his brief on appeal. Thus much of

the authority J.F.S. presents and the arguments he makes are not helpful in a resolution of this case. For example, the principal case J.F.S. relies on, *State v. Horne*, 12 Utah 2d 162, 364 P.2d 109 (1961), focuses on the need for the victim to establish "earnest resistance," a requirement that has been eliminated under the new statutory definition of "without consent." *Id.* 364 P.2d at 112.

fifteen year-old male friends, were "running around and laughing," and if they "knew what was going on they thought it was a joke." Given the circumstances, P.A. could have reasonably concluded that any type of outcry would have been useless.

Furthermore, P.A.'s delay in reporting the rape does not necessarily prove she consented to sexual intercourse. The Utah Supreme Court, faced with a similar argument in *State v. Archuleta*, 747 P.2d 1019, 1021–24 (Utah 1987), rejected the proposition that a victim's delay in reporting rape is inconsistent with a claim of lack of consent. P.A.'s delayed reporting is not inconsistent with her claim that she was raped.[6] The embarrassment and shame that is characteristic of rape victims prevents many victims from reporting the incident.[7] P.A., a young, sexually inexperienced teenager, testified that she felt "dirty" and embarrassed about what had happened. P.A. also did not think anyone would believe her, an attitude apparently common in date rape situations where the victim may have initially willingly gone with the perpetrator. *See* note 6, *supra.* Given P.A.'s guilty feelings, her embarrassment, age, lack of sexual experience and that she was moving to another state the next day, we find her delay in reporting was not necessarily inconsistent with the judge's finding of lack of consent.

Finally, defendant argues that because of the lack of physical evidence there was insufficient evidence to support his rape conviction. However, lack of physical evidence does not necessarily mean there is insufficient evidence to support a conviction of rape. In *Archuleta*, a jury found the defendant guilty of raping a mentally impaired woman. In reviewing defendant's claim that there was not enough evidence to establish lack of consent beyond a reasonable doubt, the Utah Supreme Court stated: "[T]he principal evidence supporting the conviction in this case consisted of the victim's testimony, there being no decisively corroborating physical evidence. We again decline to adopt the position that the testimony of a rape victim, without more cannot support a conviction." *Id.* at 1021.

Rape is a crime in which corroborating evidence is usually unavailable. As one commentator persuasively notes:

> In most [rape] cases, there are no witnesses. The event cannot be repeated for the tape recorder—as bribes or drug sales are. There is no contraband—no drugs, money, no stolen goods. Unless the victim actively resists, her clothes may be untorn and her body unmarked. Medical corroboration may establish the fact of penetration, but that only proves that the victim engaged in intercourse— not that it was nonconsensual or that this defendant was the man involved. Moreover, the availability of medical corroboration turns not only on prompt and appropriate treatment by police and medical personnel but, in the first instance, on the victim not doing what interviews find to be the most immediate response of many rape victims: bathing, douching, brushing her teeth, or gar-

---

**6.** In her article entitled *Rape*, Susan Estrich discusses the significantly low reporting rates of victims of non-stranger rape, and states:

> A very small minority of the victims of non-stranger, less violent rapes perceive themselves to be rape victims, notwithstanding that they all felt forced to have sex against their will through force or threat of force. Among the minority who do perceive themselves as rape victims, only a minority of that group contact the police.... Forced sex among non-strangers, particularly in social situations, is rarely perceived as a crime, and by all indicators, rarely reported as such....

Estrich, *Rape*, 95 Yale L.J. 1087, 1168 (1986).

**7.** As one commentator notes: "[W]omen in general ... are deterred from bringing legitimate complaints of rape by the social stigma associated with such a charge. Our culture claims rape as a weapon in the power struggle between the sexes; women, socialized to feel ashamed of being raped, privatize the experience. They often conceal the fact that they have been raped in order to avoid a second, public victimization by friends, family, and the judicial system." *To Have and To Hold: The Marital Rape Exemption and the Fourteenth Amendment*, 99 Harv.L.Rev. 1255, 1269 (1986).

gling. On the surface, at least, rape appears to be a crime for which corroboration may be uniquely absent.

Estrich, *Rape*, 95 Yale L.J. 1087, 1175 (1986).

We conclude the evidence supports the juvenile court's finding that P.A. did not consent to intercourse with J.F.S. After listening to J.F.S. and P.A. testify and observing their demeanor, the juvenile court judge explicitly found P.A. to be the more credible witness. P.A. testified that J.F.S. pushed her into the pump room. When she tried to get away, J.F.S. went after her and forced her back into the room. P.A. kept telling J.F.S. "no" and that they "were friends," but J.F.S. didn't respond. Instead, J.F.S. continued fondling her and pulling down her pants and underwear. P.A. struggled, and hit him in order to make him stop. Nevertheless, J.F.S. continued. He straddled P.A., held her down, and forced her to have intercourse.

P.A.'s story is further corroborated by A.S. The next day when A.S. asked P.A. how she was doing, P.A. started crying and shaking. P.A. told A.S. that she hated J.F.S. because he had been forceful and showed A.S. bruises on her arm. We do not believe the juvenile court's finding of lack of consent was against the clear weight of evidence and conclude the facts in the record adequately support the conclusion that P.A. expressed her lack of consent through words and conduct, as required by section 76–5–406(1), and/or that J.F.S. overcame P.A. through the application of physical force as provided by section 76–5–406(2).

## ATTEMPTED RAPE OF A.S.

■ J.F.S. also claims there was insufficient evidence to support a finding that he was guilty of attempting to rape A.S. J.F.S. claims A.S. consented to his initial sexual advances, and that he voluntarily stopped before intercourse occurred.

After reviewing all the evidence, the juvenile court judge found A.S. to be the more credible witness. The judge also found that while there was a question as to penetration, J.F.S. "continued in his efforts [to have sexual intercourse with A.S.] beyond that which could be interpreted as consensual." In essence, the judge found that while J.F.S. and A.S.'s encounter started as a mutual romantic encounter, A.S. never consented to sexual intercourse, and yet J.F.S. nevertheless continued in his efforts to have intercourse with A.S. against her will.

As with defendant's prior adjudication, we review his sufficiency of the evidence claim by determining whether the juvenile court's finding that A.S. did not consent to J.F.S.'s attempt to have intercourse with her is "against the clear weight of evidence." *State v. Walker*, 743 P.2d 191, 193 (Utah 1987).

According to Utah Code Ann. § 76–5–406, lack of consent can be expressed "through words or conduct." J.F.S. not only fails to analyze the new standard of consent, but also to cite any relevant case law in support of his claim that there was insufficient evidence to convict him of attempted rape. Defendant's only point is that he voluntarily stopped his sexual advances. The record supports a contrary conclusion.

Although it is undisputed that A.S. and J.F.S.'s encounter began as a consensual romantic encounter, this changed when J.F.S. became aggressive and forced himself on A.S. When J.F.S. started unbuttoning A.S.'s shirt and pulling her underwear down, A.S. got scared and told J.F.S. to stop. Instead of stopping, J.F.S. laid down on top of her and continued to fondle her. A.S. again told J.F.S. "no" and that she did not want to have sexual intercourse. J.F.S. ignored her and inserted his finger in her vagina. In an attempt to get away, A.S. began scooting across the floor towards the door. J.F.S. then tried to insert his penis in A.S.'s vagina. A.S. turned sideways and then hit J.F.S. "really hard." Eventually A.S. was able to push him off, after which she got up, went around the

corner and started crying. J.F.S. followed her and said he was sorry.

The evidence supports a conclusion that J.F.S. had taken significant steps towards his goal of sexual intercourse with A.S. and was prevented from consummating the act by A.S.'s struggle, not by his voluntary withdrawal of pursuit of A.S. The juvenile court's finding that A.S.'s actions expressed lack of consent was not against the clear weight of the evidence and we therefore affirm the juvenile court's conclusion that J.F.S. committed attempted rape.

JACKSON and ORME, JJ., concur.